UNITED STATES of America,
Plaintiff-Appellee,

v.

John E. IRWIN, Defendant-Appellant.

No. 78–3022.

United States Court of Appeals,
Ninth Circuit.

Jan. 31, 1980.

As Modified March 26, 1980.

Michael H. Weiss, San Francisco, Cal., for defendant-appellant.

Floy E. Dawson, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before GOODWIN and WALLACE, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

John E. Irwin has appealed his conviction of distributing cocaine in violation of 21 U.S.C. § 841(a)(1) and of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846.

### Factual Background

In December, 1977, the Denver Police Department arrested Irwin for possession of cocaine. In exchange for a dismissal of the criminal charge against him, Irwin agreed to become an informant for the Police Department. To "work off" the charge, Irwin first gave information that led to the arrest and conviction of his source and later attempted to set up some large scale drug transactions.[1]

In February, 1978, Irwin met Darrell Wisdom, a Drug Enforcement Administration (DEA) agent who was posing as a large scale drug dealer. Irwin did not know Wisdom was an undercover agent, although Wisdom knew that Irwin was working as a confidential informant for the Denver Police Department. Based upon Irwin's negotiations with Wisdom, two DEA agents later informed the Denver Police that they thought Irwin was "double dealing", i. e., acting as an informant and selling drugs on the side.

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. Irwin was allowed considerable freedom in working on the drug transactions and was not required to inform the Police Department of his negotiations until a seizure was imminent.

In March, 1978, Irwin learned through a friend of Sharon Baker, his girl friend, that Frank McLister, who lived in the San Francisco area, might have a pound or two of cocaine to sell. Irwin arranged by telephone to have the cocaine available for a sale to Wisdom. On March 6 Irwin and Baker flew to San Francisco, and Wisdom flew there the following day. After making final arrangements for the sale, Wisdom met Irwin, McLister, Baker, and Thane Rucker, an associate of McLister, in a camper parked outside the San Francisco Hilton. After Wisdom had seen the cocaine, agents arrested Irwin, Baker, McLister, and Rucker.[2]

Irwin and Baker were released on bail and returned to Denver. Between March 17 and April 13, 1978, Wisdom and Irwin engaged in several telephone conversations. Each claims the other initiated the calls. While there is some dispute regarding what was said in most of the telephone conversations, it is apparent that the calls were made without the consent of Irwin's counsel.[3] It is conceded that following the telephone conversations, Irwin arranged a meeting in Denver between Wisdom and a potential seller of cocaine from New York. Before any sale was consummated, Wisdom advised Floy E. Dawson, Assistant United States Attorney in San Francisco, what had transpired and was requested by Dawson to have no further contact with Irwin or Baker.

**2.** At trial, Irwin claimed that he was acting in his capacity as an informant when he set up this transaction.

**3.** A conversation on April 4 between Irwin and Wisdom was taped, and the audio tape was produced and considered by the court on motions to dismiss. In this conversation Irwin stated that his attorney had no knowledge that he was making the call and that his attorney had told him "not to talk to anybody". There was some discussion of possible sale to a New York contact, but Wisdom stated that they would first have to work out something with the United States Attorney and Irwin's attorney in this case. Wisdom suggested that Irwin might tell his counsel that he thought "this was the way" it was in his "best interest to go". In

*District Court Proceedings*

Irwin, Baker, McLister, and Rucker were each charged with conspiracy to distribute and distribution of cocaine. Irwin and Baker filed motions to dismiss the indictment on grounds of prosecutorial misconduct and violation of a plea agreement. On the basis of affidavits introduced by both the Government and the defendants, the tape of the April 4 telephone conversations, legal memoranda and oral argument, the district court denied both motions, without an evidentiary hearing. The court stated, however, that any inculpatory statements made by Irwin to Government agents subsequent to his arrest and appointment of counsel would be suppressed.

At trial it was the Government's theory that Irwin, although working as an informant for the Denver Police Department, was also trafficking in drugs. Irwin's defense was that he was working as an informant at all times and was setting up the San Francisco sale to "work off" his arrangements with the Denver Police Department.[4] The jury returned a guilty verdict against Irwin on both the conspiracy and distribution charges.[5]

*Contentions on Appeal*

Appellant contends that (1) the indictment should have been dismissed because (a) a Government agent's "gross intrusion into the attorney-client relationship" deprived him of Fifth and Sixth Amendment rights, and (b) he had entered into a disposi-

this conversation Irwin also said that he had told his attorney that he went to California "purely on his own" and was not sent by any representative of the Denver Police Department.

**4.** Codefendant McLister's defense was that Irwin was actually the source of the cocaine and had framed McLister.

**5.** Baker was also convicted on both counts. She failed to appear for sentencing and is now a fugitive. McLister was acquitted on the conspiracy charge but found guilty of distribution. Conviction was reversed and the case remanded for a new trial. Rucker was acquitted on both charges.

tional agreement with Government agents and performed his part of the agreement; and (2) the court erred in refusing to instruct the jury that it could find appellant not guilty if he had substantially complied with his agreement to serve as a confidential informant.

### Violation of Fifth and Sixth Amendment Rights

Irwin first contends that Wisdom's post-arrest "approaches constituted a gross subversion of Irwin's Sixth Amendment right to counsel and his Fifth Amendment rights to due process and protection from self-incrimination". He argues that Wisdom importuned Irwin to ignore the advise of his counsel that he not talk to or actively work with police or government agents, and further urged Irwin to resume his activities as a government informant. This conduct, appellant contends, requires that the indictment be dismissed, citing *O'Brien v. United States*, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967); *Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966); *Caldwell v. United States*, 92 U.S. App.D.C. 355, 205 F.2d 879 (D.C.Cir. 1953), and *Coplon v. United States*, 89 U.S.App. D.C. 103, 191 F.2d 749 (D.C.Cir. 1951).

■ It is clear that government interference with a defendant's relationship with his attorney *may* render counsel's assistance so ineffective as to violate his Sixth Amendment right to counsel and his Fifth Amendment right to due process of law. It is equally clear, however, that not all police action which arguably could be called an interference with the attorney-client relationship is violative of those rights. The Supreme Court in *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), and this court in *United States v. Glover*, 596 F.2d 857 (9th Cir. 1979), recognize that the Sixth Amendment does not establish any *per se* rule and suggest guidelines for determining whether an accused's constitutional rights are violated.

In *Weatherford v. Bursey*, Weatherford, an undercover agent, was charged with Bursey with vandalizing a county selective service office. In order to retain his undercover status, Weatherford continued a masquerade that he was being prosecuted for the incident and on two occasions met with Bursey and his counsel to discuss strategy for the approaching trial. Bursey discovered Weatherford's true status at the trial. After serving an eighteen month sentence, Bursey filed an action under 42 U.S.C. § 1983 alleging that Weatherford's presence at the pretrial conferences deprived him of effective assistance of counsel and due process of law. The district court found for the defendants in all respects, but the Court of Appeals reversed, ruling that "whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial." 429 U.S. at 549, 97 S.Ct. at 840, 841 (quoting appeal court's opinion, 528 F.2d 483, 486 (1975)). Reviewing *O'Brien, supra* and *Black, supra,*[6] the Supreme Court disagreed with the court of appeals' conclusion that these decisions required a *per se* rule. The Court stated that "[i]f anything is to be inferred from these two cases with respect to the right to counsel, it is that when conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial." *Id.* 429 U.S. at 552, 97 S.Ct. at 842.

On the other hand, the Court did not agree with petitioners that whenever a defendant converses with his counsel in the presence of a third party, the defendant assumes the risk and cannot complain if the third party turns out to be a government informer. The Court continued:

> Had Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise [Bursey's counsel]; had any of the State's evidence originated in these

---

**6.** In both *O'Brien* and *Black* convictions were reversed per curiam because the Government, through illegal electronic eavesdropping, had

overheard conversations between the defendant and his counsel prior to trial. The court ordered new trials.

conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey-Wise conversations about trial preparations, Bursey would have a much stronger case.

429 U.S. at 554, 97 S.Ct. at 843 (footnote omitted).

The Court also indicated that the purpose of the intrusion was an important factor to consider. Weatherford had not attended the meetings for the purpose of discovering defense secrets. Rather, Bursey had invited him to attend, and legitimate law enforcement objectives required that he continue to conceal his identity.[7]

This court recently considered the effect of *Weatherford* and other cases bearing on the Sixth Amendment issue in *United States v. Glover, supra*.[8] The police arrested Glover when he attempted to sell stolen gems to an undercover agent. Prior to trial, FBI agents talked to Glover in the absence of counsel. "They told him he would be released if he would reveal the location of the gems and testify against his co-defendants. When he asked if his attorney should not be present, the agents responded she had given her consent to the questioning," but it later became apparent

that she had not. 596 F.2d at 859. Although the meeting in the absence of counsel produced no evidence against the defendant at the trial, the defendant moved for dismissal of the indictment because of the FBI's attempted interference with the attorney-client relationship. He argued that prejudice is irrelevant in determining whether a defendant has been denied the right to counsel. Citing *Weatherford*, we stated that "[n]ot all police action that arguably could be called an interference with the attorney-client relationship is violative of the Sixth Amendment right to counsel." *Id.* at 863. We recognized that *Weatherford* was "factually distinguishable from the situation" in *Glover*[9] but did not believe "that the factual distinction overshadow[ed] an important principle to be read from the case: that the existence or nonexistence of prejudicial evidence derived from an alleged interference with the attorney-client relationship is relevant in determining if the defendant has been denied the right of counsel." *Id.* at 863–864. Since the defendant had not been prejudiced, we found no Sixth Amendment violation.[10]

■ From *Weatherford* and *Glover* and the cases they interpret,[11] it is apparent that mere government intrusion into the attorney-client relationship, although not

---

7. Bursey's situation presented none of the elements that would require a finding that his constitutional rights had been violated. The contacts did not contribute directly to the evidence since Weatherford's testimony "revealed nothing said or done at the meetings between Bursey and [his attorney] . . . ." *Id.* 429 U.S. at 555, 97 S.Ct. at 843. It could not be argued that the prosecutor was unfairly advantaged through disclosure of the defense's plans and strategies since the district court had found that Weatherford communicated nothing at all to his superiors or to the prosecution about Bursey's trial plans. "There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment . . . ." *Id.* at 557, 97 S.Ct. at 845.

8. *Glover* was decided subsequent to the filing of briefs and shortly before oral argument in the case now before the court. It was not discussed by counsel in oral argument.

9. In particular, we noted that in *Weatherford* "the government agent was invited to attend the strategy sessions between Bursey and his attorney", whereas in *Glover* "the FBI agents had initiated the contact with Glover".

10. We noted also that even "if Glover could establish that a Sixth Amendment violation occurred, he has cited no federal case that has remedied the violation by dismissal." See also *United States v. Owen*, 580 F.2d 365, 367 (9 Cir. 1978), where this court recognized that dismissal for governmental misconduct "is an extreme sanction which should be infrequently utilized" and requires a showing of prejudice.

11. In addition to *Black, supra,* and *O'Brien, supra,* the Court in *Weatherford* discussed *Caldwell v. United States, supra, Coplon v. United States, supra,* and *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

condoned by the court,[12] is not of itself violative of the Sixth Amendment right to counsel. Rather, the right is only violated when the intrusion substantially prejudices the defendant. Prejudice can manifest itself in several ways. It results when evidence gained through the interference is used against the defendant at trial. It also can result from the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney,[13] and from other actions designed to give the prosecution an unfair advantage at trial.

### Prosecutorial Misconduct

Appellant argues that the governmental misconduct had a three pronged prejudicial effect: (1) "it elicited incriminating evidence from the defendant"; (2) it "substantially destroyed the defendant Irwin's attorney-client relationship"; and (3) "the officer's questioning of Irwin sought to discover the strategy which Irwin and his counsel were planning for their defense".

 As stated earlier the district court denied the motions to dismiss the indictment without an evidentiary hearing. If, in fact, a material issue of fact were raised "which if resolved in accordance with [appellant's] contentions would entitle him to relief", an evidentiary hearing would be required. *Wright v. Dickson*, 336 F.2d 878,

881 (9 Cir. 1964), *cert. denied*, 386 U.S. 1012, 87 S.Ct. 1360, 18 L.Ed.2d 444 (1967); see also *United States v. Carrion*, 463 F.2d 704, 706 (9 Cir. 1972). On the other hand, if the affidavits show as a matter of law that appellant was or was not entitled to relief, no hearing was required.[14] All of the affidavits were considered by the district court, and the court concluded that an evidentiary hearing was not required. In determining whether this conclusion was justified and whether appellant was prejudiced by prosecutorial misconduct, we must assume that the factual allegations in appellant's affidavits are true.

### (1) Incriminating Evidence

 As the Government concedes, incriminating statements were made. In the conversation between Irwin and Wisdom on April 4 Irwin admitted that both he and Wisdom knew that Irwin was not in San Francisco at the direction of the Denver police. Irwin said also that he had told his attorney that he "went out there unauthorized", that he was "purely on [his] own". In denying the motion to dismiss the indictment, the district judge made it clear that any incriminating statements would be suppressed under the doctrine announced in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).[15] The tape recording of the April 4 conversation, which contradicted Irwin's testimony at tri-

---

12. In *Glover* we stated:
 We do not condone the behavior of Agent Robinson. We agree with the district court that, had the interviewing agents obtained any evidence that could have been used against Glover, this would be a different case.
 *Id.* at 864.

13. In *Glover*, we distinguished *People v. Moore*, 57 Cal.App.3d 437, 129 Cal.Rptr. 279 (1976) and *Commonwealth v. Manning*, 373 Mass. 438, 367 N.E.2d 635 (Mass.1977), cited by appellant, where Sixth Amendment violations were found partially on the basis that the police had attempted to convey to the defendant that his counsel was incompetent. We discuss these cases later in this opinion.

14. As this court said in *Carrion, supra*, 463 F.2d at 706, "Evidentiary hearings need be held only when the moving papers allege facts with suffi-

cient definiteness, clarity, and specificity to enable the trial court to conclude that relief must be granted if the facts alleged are proved."

15. In *Massiah* the Court held that the petitioner was denied the guarantee of the Sixth Amendment right to assistance of counsel "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. at 1203. As this court noted in *Glover, Massiah* establishes "an *Exclusionary rule* for statements obtained as a result of an interrogation conducted after indictment and without the presence of defendant's counsel." 596 F.2d at 864, n. 12.

al, was not referred to in cross-examination or offered for impeachment purposes. Nor is there any evidence that the incriminating statements in any way altered or affected Irwin's defense. We find no merit in appellant's contention that he was prejudiced by his incriminating statements.

### (2) Destruction of Attorney-Client Relationship

Appellant next contends that the agent's misconduct substantially destroyed his attorney-client relationship. This contention was first asserted in a memorandum filed in support of Irwin's motion to dismiss because of prosecutorial misconduct. We find nothing, however, in the supporting affidavits submitted by Irwin and his court appointed counsel to suggest that Irwin lacked confidence in his counsel or was dissatisfied with counsel's representation. Clearly Irwin did not at any time request new counsel, although his motion to dismiss was denied over two months before his trial commenced.[16] The record indicates a competent and vigorous defense on the part of appellant's counsel both at trial and on appeal.

The cases of *Commonwealth v. Manning, supra,* and *People v. Moore, supra,* are distinguishable. As this court noted in *Glover,* in *Manning* in an apparent "effort to convince the defendant to cooperate, the agent made disparaging remarks about counsel and warned that the tactics chosen by counsel would not ensure that the defendant would stay out of jail". 596 F.2d at 861. In *Moore* the defendant was told "not to inform his attorney about his dealings with the district attorney's office" and one investigator "disparaged the competence of his attorney and falsely said he had been disbarred". *Id.* at 862, n. 4.

There is no evidence here that Wisdom disparaged the competence of Irwin's coun-sel; nor is there any evidence that Irwin was told not to inform his counsel of his dealing with Wisdom. It is true that Wisdom suggested to Irwin, and Irwin readily agreed, that Irwin suggest to his counsel that an attempt should be made to reach an agreement with the United States Attorney that Irwin should continue to act as an informant. In the tape recorded conversation of April 4, Wisdom said at one point:

> And the thing about it is—if you go in and present this to the U. S. Attorney, okay, this way, out there, then that guy can probably tell you. You can probably have an agreement between your Public Defender and the U. S. Attorney that if, in fact, you did materialize these cases and they went down, then whatever he told you would happen, would happen. You know, it wouldn't be one of these things where—ah—you'd be going doing something and then we wouldn't do anything for you.

Later in the conversation, after Irwin had told Wisdom what he was trying to "put together", Wisdom replied:

> Okay, well that's, hey, that sounds super but like I say, you know, I just want to make sure that we get that other problem resolved—ah—before, you know, we start really working. Once that's resolved, hey, I'll work anything you want to work anywhere you want to work however you want to work.

Wisdom stated he would call the United States Attorney and tell him that Irwin would like "to talk to him or whatever" and concluded—"what I would do is talk to my own attorney first and tell him, hey, this is the way you think it's—your best interest to go."

While Wisdom's conduct was highly improper, we find no evidence to support the conclusion that it destroyed the attorney-client relationship.[17]

---

16. The memorandum was filed on April 27 and was heard on May 4. The trial did not commence until July 17. Irwin was present at the hearing on May 4. Nothing was presented at the hearing to show any destruction of the attorney-client relationship. Rather, there was an extensive colloquy between court and counsel on the motion to dismiss on the ground of violation of a plea agreement.

17. It may be noted also that Irwin reported to his counsel, and Wisdom reported to the Assistant United States Attorney on their various

Appellant argues "that the Government did not deny that Agent Wisdom's misconduct did serious damage to defendant Irwin's relationship with his attorney." "Rather", appellant claims, "the [Assistant U. S. Attorney] suggested, 'If the subjective interpersonal relationship between attorney and client has been unalterably damaged in these cases, the proper remedy may be the appointment of other counsel . . .'". Appellant suggests that this indicates "the seriousness of the prejudice toward Irwin herein".

This is hardly an accurate statement regarding the Government's position. Appellant was seeking dismissal of the indictment. The Government first contended that even in "fairly flagrant factual situations", dismissal is not the remedy, noting that under *Massiah, supra,* the remedy was exclusion of the statements rather than dismissal. Arguing that Irwin had not been harmed and noting that nothing he said would be used against him, the Government continued with the statement quoted by appellant and urged that "the drastic remedy of dismissal of the indictment is unwarranted."

We need not decide what remedy may be appropriate when the relationship between a defendant and his court-appointed counsel is in fact substantially destroyed by Government interference. We have determined that there is no evidence here that any action of the Government destroyed the attorney-client relationship and that the record indicates a competent and vigorous defense by Irwin's court appointed counsel. We find nothing in the record to justify dismissal of the indictment.

### (3) Discovery of Defense Strategies

While it is true that Irwin's counsel and the Assistant United States Attorney discussed the nature of Irwin's defense, it does not appear that Wisdom was seeking to discover defense strategy or that anything was disclosed in the conversations which affected either the prosecution or defense of the case. Defense counsel had revealed the nature of the defense in his initial conference with the prosecutor.[18]

### *Dispositional Agreement*

Appellant contends that he had entered into a postarrest dispositional agreement with agent Wisdom to act as an undercover informant in another investigation in the Denver area in exchange for a dismissal of the charges in this case. He claims that he performed his part of the agreement and that the charges, therefore, should have been dismissed. The Government recognizes the enforceability of bargains of this nature,[19] but contends that no bargain was reached in this case.

As discussed above, the district court denied the motions to dismiss without an evidentiary hearing. Following an extended colloquy with counsel for the defendants, in which the court referred specifically to the affidavits of Irwin and his counsel, the court concluded that they failed to show that an agreement was reached. He found accordingly that no evidentiary hearing was

---

conversations, although it is not clear whether Irwin told his counsel all that transpired in the telephone conversations, including the April 4 conversation which was taped.

The affidavit of Irwin's counsel states, with respect to the initial conversation: "On Friday morning, March 17, 1978, I received a phone call from Mr. Dawson [Assistant U. S. Attorney]. He advised me that he had received a phone call from either S.F. DEA agent Richard Camps or Denver agent Darrell Wisdom (I'm not sure which) telling Dawson that my client, JOHN IRWIN, had been in to see Wisdom and was voluntarily offering his services as an informant as consideration for dropping the charges against him and SHARON BAKER here. I told Mr. Dawson that I did not autho-

rize Wisdom to speak to my client or vice versa and did not want Wisdom to have any further contact with Irwin. Mr. Dawson stated he had or would so advise Wisdom but that he intended to use anything IRWIN had said to Wisdom in this case."

18. *United States v. Orman,* 417 F.Supp. 1126 (D.Colo., 1976), upon which appellant relies, is distinguishable. *Orman* involved surreptitious eavesdropping by DEA agents of the defendant's consultations with her court appointed lawyer. The court held that "where there is surveillance of attorney-client conferences, prejudice must be presumed . . ."

19. See, e. g., *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *United States v. Garcia,* 519 F.2d 1343 (9 Cir. 1975).

required. It is necessary to examine in some detail the affidavits of appellant and his attorney to determine whether they raised factual issues requiring a hearing.

Irwin, in his affidavit, states agent Wisdom told him that "if [Irwin] would agree to help 'turn a deal' he would talk to the Assistant U. S. Attorney in San Francisco and make a favorable recommendation in the case pending there." A few days later Wisdom called Irwin and told him that "he had talked to the Assistant U. S. Attorney in San Francisco, and while he could not guarantee for sure since the final say-so was up to the Assistant U. S. Attorney, it would be favorable to [Irwin] and [his] interests if [he] would help turn a deal . . ."

Within a day or two thereafter Irwin talked with Weiss, his attorney, who told him of "the three possible dispositions of my case he had discussed with the Assistant U. S. Attorney. One of the possible dispositions he mentioned to me was that if the DEA made a favorable recommendation of its using me, that the charge against me in San Francisco could be dismissed."

A few days later Irwin told Wisdom of the person seeking a buyer for several pounds of cocaine and asked Wisdom whether he was interested "and whether he could help [Irwin] get a favorable recommendation". Wisdom replied that he was "very interested". At Wisdom's request Irwin and Baker made arrangements for Wisdom to meet the owner of the cocaine. Finally, Irwin picked up and drove the prospective seller to a Denver bank where Wisdom showed the seller the money for the transaction. Irwin's affidavit concludes:

> I have not been asked to do anything further at this point regarding this or any other "deal." However, it was my understanding that both my and SHARON BAKER's involvement in this transaction was pursuant to an agreement or understanding I had with agent Wisdom that he would make a favorable recommendation to the Assistant U. S. Attorney in San Francisco regarding the pending charges there, which would then result in the charges there being dismissed.

Appellant's attorney, Michael Weiss, in his affidavit stated that Floy E. Dawson, Assistant United States Attorney, told Weiss of three "possible dispositions", one of which was dismissal of the charges in return for Irwin's services as a confidential informant. Weiss relayed the possible dispositions to Irwin. Later Irwin informed Weiss that he and Baker had become confidential informants for Wisdom. Weiss reported this information to Dawson, and that "Irwin and Baker were in the process of setting up a transaction for Wisdom in Denver as part of the agreement or understanding that Wisdom would make a favorable recommendation to Dawson to dismiss the charge. . . ." Dawson told Weiss that "he was not 'committed' or bound by any agreement of Wisdom's" and "had not made up his mind yet what disposition he was going to offer Irwin and Baker." In a subsequent conversation, Weiss was informed by Irwin that Irwin "had continued at agent Wisdom's request to set up a cocaine transaction as a confidential informant". Weiss gave Dawson this information and said that they had become involved in the transaction "pursuant to an understanding that they thought they had with Wisdom". Weiss asked Dawson whether he was going to dismiss the charges. Dawson replied that "he would not agree to dismiss the charges against Irwin, but that the Government "would recommend leniency to the court", and that "he [Dawson] was telling Wisdom to stop all communications with Irwin and Baker immediately and stop using them as confidential informants."

■ Assuming *arguendo* that these affidavits represent the true facts, they do not show that the Government ever promised to dismiss the charges against appellant. The responses of both Wisdom and the Assistant United States Attorney were qualified. Wisdom never promised that the Government would drop the charges, but only that he would "make a favorable recommendation" and that the ultimate decision rested with the United States Attorney. The Assistant United States Attorney discussed the bargain as a "possible disposition", but

never agreed to it. Moreover, after undercover work had begun, appellant's attorney's inquiries as to whether the Government intended to dismiss the charges indicate that he was aware that no bargain had been struck. The parties reached no binding agreement requiring dismissal of the charges. At most, appellant, on his own initiative, decided to act as a confidential informant in return for promises that Wisdom would make favorable recommendations to the prosecutor.[20] There are no allegations that Wisdom failed to honor this promise. We conclude that the trial court did not err in denying the motion to dismiss without an evidentiary hearing. The moving papers failed to allege facts sufficient to enable the trial court to conclude that relief must be granted if the facts alleged were proved. See *United States v. Carrion, supra.*

## Jury Instructions

At the trial, Irwin claimed he lacked criminal intent in the San Francisco drug transaction because he was acting as an undercover police informant. He otherwise admitted his participation. He now argues that the court improperly rejected two jury instructions on criminal intent and gave other instructions which misstated the law and placed an impermissibly high burden of proof on him. We disagree with these contentions.

The trial court rejected the following instructions offered by the defendant:

### Defendant Irwin's Instruction No. 1

One who, under the direction of an officer of the law or upon his own initiative, and without criminal intent, feigns complicity in the commission of a crime merely for the purpose of detecting the perpetrator thereof, with a view to prosecution of the perpetrator, is not an accomplice, aider and abettor, or conspirator, and you should find not guilty.

### Defendant Irwin's Instruction No. 3

If you find the evidence in this case is that (1) defendant IRWIN entered into an agreement with the Denver Police Department through its agents to cooperate with it by providing information and to act as a confidential informant, and (2) defendant IRWIN has substantially complied with his part of the agreement, then you must acquit IRWIN on all counts.

"Substantially complied with" means defendant *IRWIN* has provided the basic information and performed as a confidential informant in a manner required of him and that the information provided and conduct performed are in satisfactory compliance with the agreement.

Appellant argues that when the sufficiency of his cooperation in a plea agreement is an issue, the defendant/informant is entitled to be found free of criminal intent if he "substantially complied" with his part of the agreement and therefore, that his offered instruction number 3 on "substantial compliance" should have been given to the jury.

■ We cannot agree with appellant that substantial compliance with an agreement to act as an informant necessarily absolves him of criminal intent.[21] Defendant's reliance on *Palermo v. Warden, Green Haven State Prison,* 545 F.2d 286 (2 Cir. 1976) *cert. dismissed* 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977), *United States v. Carter,* 454 F.2d 426 (4 Cir. en banc, 1972)

---

**20.** It is apparent that both appellant and his counsel recognized that agent Wisdom had no authority to make any binding commitment and could simply make a "favorable recommendation" to the United States Attorney.

**21.** A major difficulty with defendant's proposed instruction is that it would grant the defendant blanket immunity on all future criminal acts so long as he substantially complied with the provisions of his plea agreement. The rejected instruction requires two findings for acquittal: (1) that a plea agreement existed, and (2) that the defendant substantially complied with his part of the agreement. According to this instruction, the defendant could commit criminal acts, such as the transaction in San Francisco, solely for his own benefit, and he would still be absolved of guilt so long as he substantially complied with his plea agreement with the Denver Police Department.

*cert. denied* 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974), and *United States v. Paiva*, 294 F.Supp. 742 (D.D.C.1969) is misplaced. In each of those cases the defendants were attempting to enforce a plea agreement by claiming compliance with their side of the bargain; they were not raising substantial compliance as a defense for committing additional criminal acts subsequent to the agreement, as the defendant does in this case. Where the defendant acts with the intent to profit illegally from the transaction, incidental gain that might be derived on a plea agreement has no relevance.[22] Here the trial court instructed the jury, *inter alia*, that "the government must prove not only the act . . . but that the acts were done with a criminal purpose." The court also stated that if "the sole purpose was to assist in the apprehension of others who were violators and there's no criminal purpose on the part of the participant, then there would be no criminal responsibility . . ." and that "[t]he basic concern . . . is whether the sole purpose was a lawful one. . ." We believe these instructions properly informed the jury of the applicable law.

Nor do we find any error in the court's failure to give defendant's instruction number 1. The instructions that were given reflected the substance of the rejected instruction. The essence of the defendant's proposed instruction is that one who "feigns

complicity in the commission of a crime merely for the purpose of detecting the perpetrator" and assisting in the perpetrator's prosecution is not guilty of a crime. The essence of the instruction [23] by the court similarly is that one who feigns complicity for the "sole purpose" of detecting the perpetrator and assisting in his prosecution is not guilty of a crime. We see no difference in the essential meaning of these instructions. The language "merely for the purpose" in defendant's proposed instructions may be interchanged with the language "sole purpose" in the given instructions with no significant change in meaning. We conclude the given instructions neither misstated the law nor could confuse the jury.

Finally, we fail to see how the given instruction or the rejection of the "substantial compliance" instruction placed an impermissible high burden of proof on the defendant. The jury was told that "the United States must prove as to each defendant, beyond a reasonable doubt, each of the elements of the offense charged including that the defendant charged in each count acted knowingly and willfully and with the purpose to violate the law." [24] Taken in conjunction with other instructions on criminal intent, this instruction accurately apprised the jury of the requisite burden of proof on all elements of the crime

---

**22.** We do not hold, however, that a person would be guilty of an offense where he participates in criminal activity solely to protect or maintain his undercover status. In such a situation the action might be necessary to continue to fulfill his part of the plea agreement.

**23.** The court instructed the jury that "one is not guilty of an offense if . . . there was no purpose to violate the law" and that there would be no criminal responsibility "if . . . the sole purpose was to assist in the apprehension of others . . . and there's no criminal purpose on the part of the [defendant]." The jury was also told that "[t]he basic concern . . . is whether the sole purpose was a lawful one, that is to help in the apprehension of one or more criminals." The court further clarified the concept of criminal purpose through the following instruction:

Now, if there is, as to any defendant, an intention to gain financial profit from a crimi-

nal venture or help someone else to do that, then the intent would not be innocent. And that would be so even though there might be the intention or prospect at some later time to inform the authorities of the activities of one or more of the other participants.

**24.** In another instruction the court emphasized the burden of proof:

As I say, there are two essential elements. There must be the act forbidden by law and the intent to do the act. Before any defendant can be found guilty of a crime, the government must establish beyond a reasonable doubt that the defendant was forbidden to do the act; that the act was done and that it was done intentionally and purposefully. As noted earlier, the court also stated that one does not have a "purpose to violate the law" where his "sole purpose was to assist in the apprehension of others."

including the necessity for criminal intent. See *United States v. Elksnis*, 528 F.2d 236 (9 Cir. 1975).[25]

The judgment is affirmed.

---

**25.** In *Elksnis*, under circumstances similar to those before us we said that "[i]n reviewing jury instructions, we must judge them in context and as part of the whole trial. Isolated individual statements do not by themselves establish error. The question is whether the complete package was misleading or represented a statement inadequate to guide the jury's deliberations. *United States v. Park*, 421 U.S. 658, 673–676 [, 95 S.Ct. 1903, 44 L.Ed.2d 489] (1975)." *Id.* at 238.