**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gabriel Orosco HERNANDEZ,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gustavo M. TORRES,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jose Isabel LANDA,
Defendant–Appellant.**

**Nos. 89–30232, 89–30236 and 89–30248.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 11, 1990.

Decided July 9, 1991.

Phillip J. Wetzel, Perrizo and Wetzel, Thomas Milby Smith and Vance W. Petersen, Spokane, Wash., for defendants-appellants.

Stephanie J. Johnson, Asst. U.S. Atty., Spokane, Wash., for plaintiff-appellee.

Before HUG, D.W. NELSON and BRUNETTI, Circuit Judges.

PER CURIAM:

Appellants Gabriel Hernandez, Gustavo Torres and Jose Landa appeal their conviction for trafficking in cocaine. They claim that because a fourth codefendant acted as a government informant throughout the planning stages of a joint defense, the United States invaded their attorney-client relationship and thus violated their Sixth Amendment rights. In addition, they appeal the denial of a motion to suppress evidence seized from a car. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts Relating to the Attorney–Client Privilege Issue*

On March 6, 1989, Ernesto Barajas, Gabriel Hernandez, Gustavo Torres, and Jose Landa were arrested in Walla Walla, Washington for possession with intent to distribute cocaine. The next day, agents of the Drug Enforcement Administration ("DEA") interviewed Barajas and obtained his cooperation in their ongoing investigation. On the afternoon of March 7, defendants had their initial appearance in court and Charles Baechler was appointed counsel to represent Barajas. On March 8, defendants were indicted by the grand jury.

Attorneys for the four defendants met after their appointment and agreed to conduct a joint defense. At that meeting, facts and strategies were discussed openly. Several days later, the Government informed Baechler that Barajas had agreed to cooperate with the Government.[1] Baechler claims that he asked the Government to make all contacts with Barajas through him. However, after this initial phone conversation, Baechler heard nothing from the Government. He continued to meet with attorneys for the codefendants and continued to plan a joint defense.[2] He also kept his client, Barajas, informed of the conversations with other counsel and the course of preparations for the joint defense.

Barajas was in frequent contact with DEA agents Dacus and Yankovich. The two agents explained that these discussions concerned another investigation, and that they and Barajas seldom talked about this case. Barajas did not inform Baechler that he was in such contact with the Government. Barajas also testified that he did not tell the Government that he had not informed his attorney of his frequent contact with the DEA agents.

On April 17, 1989, Baechler and the attorneys for Hernandez and Landa went to the prison to interview Landa and Barajas as part of their joint defense efforts. Landa was interviewed first. It was during the interview with Landa that the defense attorneys first learned of the existence of a witness who would testify that the police opened the trunk of the car in which drugs

---

[1] It is unclear precisely when Baechler was informed that Barajas was cooperating, although there is no dispute that it was within two or three days of the indictment. Both sides agree that the Government made a valid effort to inform Baechler, and the date when this actually transpired is not material.

[2] At some point during their preparations, the attorneys for Barajas' codefendants became aware of the fact that Barajas gave a statement to the Government. However, they were not aware of his additional involvement with the DEA.

were found before they had obtained a search warrant.

After speaking with Landa, the defense attorneys spoke with Barajas. They discussed the joint defense strategy with him and told him about the witness who would testify about the police opening the trunk of the car before obtaining a search warrant. Immediately after the meeting with the defense attorneys, Barajas contacted the DEA. Barajas and the agents all testified that the call was not to relay this information, but rather for Barajas to vent his displeasure that Baechler had brought co-counsel with him to the prison. Barajas also told Yankovich that he had not told the defense attorneys about his continuing contact with the Government.

Dacus then contacted the Assistant United States Attorney assigned to the case, Stephanie Johnson, to inform her that Barajas had not told his attorney about his contact with the DEA agents. Johnson then spoke, *ex parte*, to the district judge assigned to the case, Judge Quackenbush, in chambers. Judge Quackenbush suggested that Johnson contact Baechler. There is some disagreement over what happened next. The Government claims that Johnson spoke with Baechler, but Baechler claims that he did not learn the extent of Barajas' activities on behalf of the Government until May 1, when he was told that Barajas wanted to discharge him. Two days later, Hernandez' lawyer, Phillip Wetzel, saw Barajas chatting with Yankovich in downtown Spokane. Wetzel contacted Baechler and stated that Baechler seemed shocked to hear that Barajas was on friendly terms with the DEA agent. Soon afterwards, Baechler was relieved as counsel for Barajas. Barajas was appointed new counsel and entered a plea agreement.

The remaining defendants filed a motion to dismiss for invasion of the attorney-client relationship. Hearings on the motion were held before Judge Quackenbush on May 11 and May 15, 1989. The court heard testimony from three DEA agents, Baechler, and Barajas. The Government argued that it had not received any significant information from Barajas regarding conversations with Baechler or co-counsel. The court orally denied the motion to dismiss on May 15, 1989.

## B. *Facts Relating to the Search of the Car*

On March 6, 1989, police officers were conducting surveillance of Landa's residence in Walla Walla because of an informant's tip that a drug transaction was going to occur. The officers observed a gray Ford Tempo pull into a garage behind Landa's residence. Shortly thereafter, Barajas and Landa met with an undercover agent in front of Landa's home. When they produced cocaine, officers converged on the home and immediately arrested Landa and Barajas.

The agents had reason to believe that cocaine would be found in the home. Having received consent to search the house from Mrs. Landa, the police found no cocaine therein. Mrs. Landa told the officers that the Ford Tempo was not hers and, therefore, she could not give consent for them to search it. Since the officers did not have probable cause at this time to search the car, they called a K–9 unit to come and check out the car. Meanwhile, defendants Hernandez and Torres were found hiding in the garage, where the police also discovered a gun.

The K–9 unit arrived, and a trained dog, Bremo, alerted to the rear of the Tempo. The officers then arranged to get a search warrant for the car. Hoping to secure the car for a search while waiting for the warrant, the agents opened the car to see if there were any keys in the ignition. Subsequently, another DEA agent found the keys lying on the floor of the garage. He then opened the car and threw the keys onto the front seat. There is no indication that the agent did anything but open the car door, throw the keys in, and close the car door. The opening of the car to look for the keys and the reopening to throw the keys in are the searches about which appellants complain. Once the agents obtained the search warrant, they opened the

trunk of the car and found five kilograms of cocaine.[3]

No one has claimed ownership of the Ford Tempo. The car is registered to Lopez Ramirez of Tacoma, Washington. It appears to have been sold, but there is no indication of who currently has title. Hernandez testified that he rode in the car from Sunnyside, Washington to Walla Walla as a passenger and that he had the keys to the car when the police arrived. No one has admitted driving the car to the Landa home.

### C. *Procedural Background*

Barajas pled guilty and was sentenced to a four-year suspended sentence, six months in a work release program, and three years of probation. The remaining defendants, Hernandez, Torres, and Landa, were tried together. On May 19, 1989, all three defendants were found guilty of possession with intent to distribute five kilograms of cocaine and conspiracy to distribute cocaine. Torres alone was found not guilty of use of a firearm during a drug transaction.

All three defendants were sentenced to a term of 121 months. They filed a timely notice of appeal.

## II. SIXTH AMENDMENT RIGHTS

Whether appellants' Sixth Amendment rights were violated is a question of law and is reviewed *de novo*. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

█ Appellants claim that Barajas' presence as a government informant during their preparations for trial invaded their attorney-client relationship and therefore violated their Sixth Amendment rights.

It is undeniable that the sanctity of the attorney-client relationship is one of the cornerstones of our adversary system. As the Supreme Court stressed in *Upjohn Co.*

*v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981):

> The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law.... Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.

*Id.* (citation omitted).

Despite the high approbation our system has for the attorney-client privilege, the Supreme Court has twice held that government invasion of that privilege or the defense camp is ·not sufficient by itself to cause a Sixth Amendment violation. The defendant must have been *prejudiced* by such actions. *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981); *Weatherford v. Bursey*, 429 U.S. 545, 558, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977). Our circuit has also explicitly held that prejudice is required. *See United States v. Shapiro*, 669 F.2d 593, 598 (9th Cir.1982); *United States v. Bagley*, 641 F.2d 1235, 1239 (9th Cir.), *cert. denied*, 454 U.S. 942, 102 S.Ct. 480, 70 L.Ed.2d 251 (1981); *United States v. Irwin*, 612 F.2d 1182, 1186–87 (9th Cir.1980) ("it is apparent that mere government intrusion into the attorney-client relationship, although not condoned by the court, is not of itself violative of the Sixth Amendment right to counsel. Rather, the right is only violated when the intrusion substantially prejudices the defendant.") (footnote omitted).

The district judge held an extensive hearing on this issue, after which he made the following oral findings:

> Mr. Barajas' meeting with Mr. Baechler and the three other defense counsel for these defendants was not at the instance of the government. This is not a case where the government sends an agent in to meet with other defendants. This is a case where Mr. Barajas himself decided not to tell his own attorney the

---

**3.** Appellants claim that the car was opened before the K–9 unit arrived. In the court below, they argued that the *trunk* of the car was opened before the police arrived. The court found that the trunk was not opened, and appellants are not arguing that on appeal.

extent of his cooperation, and that was his own decision, not at the urging of the government. In fact, the evidence convinces me that [when] the government learned that Mr. Barajas had talked to other counsel the government was very upset by that fact. So I'm unable to find any invasion at the instance of the government in this case.

I am further unable to find that even assuming that Mr. Baechler was serving as an agent of the government in the meetings with the attorneys, which I don't find that to be the case, he didn't learn anything of any import as far as these defendants' defense, and certainly he didn't reveal anything to the government other than what he told counsel, which was that he had given a statement. So I'm unable to find, even assuming that Mr. Barajas was a government agent, that the confidence of these defendants on trial and the attorneys was invaded in any manner. For those reasons, I must deny the motion to dismiss.

The thrust of the district court's findings is that Barajas did not learn anything of any import concerning these defendants; thus, any information he could have passed on to the Government could not have been prejudicial. Furthermore, the only information he did reveal to the Government was that he had given a statement. In *Irwin*, 612 F.2d at 1186–87, we stated that

[p]rejudice can manifest itself in several ways. It results when evidence gained through the interference is used against the defendant at trial. It also can result from the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney, and from other actions designed to give the prosecution an unfair advantage at trial.

*Id.* (footnote omitted).

On appeal, we review the district court's findings for clear error. Our review of the district court's thorough transcript leads us to conclude that these findings are not clearly erroneous.

## III. MOTION TO SUPPRESS

Appellants argue on appeal that there were two material omissions in the affidavit supporting the application for a search warrant for the Ford Tempo. One regarded the warrantless openings of two of the car doors, and the other concerned the qualifications of the search dog.

■ In reviewing the issuance of a search warrant, we determine whether the magistrate had a substantial basis for concluding that the affidavit in support of the warrant established probable cause. *United States v. Angulo–Lopez*, 791 F.2d 1394, 1396 (9th Cir.1986). This standard of review is "less probing than de novo review and shows deference to the issuing magistrate's determination." *Id.* We review alleged misstatements and omissions in the affidavit de novo. *United States v. Condo*, 782 F.2d 1502, 1506 (9th Cir.1986).

### A. The Opening of the Car Door

■ Appellants argue that it was a material omission for the police to fail to mention in the affidavit supporting the application for the warrant the fact that they had opened the car door prior to receiving the search warrant. They claim that the opening of the car door constituted invalid searches and that if the magistrate had known about them, he would have denied the warrant.

The police opened a car door to look for keys and then a second time to throw the keys into the car. The drugs were eventually found in the *trunk* of the car. The appellants do not contest on appeal the district court's finding that the trunk was not opened prior to the arrival of the search warrant. Also, appellants' argument that the opening of the door could have allowed the marijuana scent to emanate from the car, tipping off the dog, is unpersuasive for two reasons. First, testimony indicates that the opening of the door took place *after* the sniff and before the warrant arrived. Second, even if the opening occurred before the sniff, the dog alerted to the trunk and rear door of the car, while the front door was the one opened.

This is not information that would have led the magistrate to deny the warrant.

B.  *Bremo's Performance*

 Appellants also argue that there was no evidence in the affidavit about the background and performance of the search dog, Bremo, which they posit was another material omission.  They argue that the affidavit did not state how many false alerts Bremo had reported and what the standards are for a dog to complete training.

The affidavit of Sgt. James Romine, Bremo's handler, described the number of hours Bremo was in narcotics training, the types of certification Bremo has received, and the number of searches he has conducted.  The affidavit stated that Bremo has conducted 250 searches and alerted 100 times.  Appellants argue that this means that Bremo falsely alerted 60% of the searches.  This contention represents a misunderstanding of the statistics.  In 250 searches, drugs were found 100 times.  In the other 150 searches, there were no drugs and the dog did not alert.  Sgt. Romine testified that Bremo has never had a false alert.  We conclude that there is no merit to the argument that there was insufficient information in the affidavit about Bremo.

AFFIRMED.