**STATE**

v.

**Norman LAURENCE.**

No. 2001–46–C.A.

Supreme Court of Rhode Island.

May 20, 2004.

Virginia M. McGinn, Providence, for Plaintiff.

Janice M. Weisfeld, Providence, for Defendant.

Present: FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

FLAHERTY, Justice.

The defendant, Norman Laurence, appeals from his convictions for first-degree murder, conspiracy to commit first-degree murder, and breaking and entering, following a jury trial in Kent County Superior Court. He was sentenced to life in prison without the possibility of parole. For the reasons stated below, we deny the defendant's appeal and affirm the convictions. A summary of the chilling facts surrounding the murder follows.

## I

### FACTS AND PROCEDURAL HISTORY

Norman Laurence, defendant, and Gretchen Nelson, his girlfriend, began a tumultuous, on-again, off-again relationship in October 1993, one of the fruits of which was the birth of their son the following September. In January 1997, during a period when Nelson and defendant were together, he accused her of having a sexual liaison with their landlord. The defendant became violent and, consequently, she asked him to leave their home. He immediately reacquainted himself with Betty Jo

Gardiner, a woman with whom he had a brief relationship a few months earlier.

On January 17, 1997, $4,000 to $6,000 was stolen from the West Warwick home that Carol Theroux (Theroux) shared with her father. The defendant telephoned Nelson that day and told her that he had just come into some money. During a visit the next weekend, defendant admitted to Nelson that he had about $3,000, and that he had stolen the money from the Theroux home with the help of Jay Young, defendant's friend and Theroux's boyfriend.[1] Nelson asked defendant whether Gardiner knew about the break-in. The defendant responded that Gardiner was, indeed, aware of the crime; it was planned at her kitchen table, and he had given her the money to hold for him.

Notwithstanding the fact that defendant had confided in Gardiner about the crime, he admitted to Nelson that he was worried because he had heard that Gardiner had cooperated with police in the past. He was further concerned that Gardiner might inform on him because he was unwilling to resume a relationship with her. On January 22, 1997, in the L.A. Café in West Warwick, Lisa Gagnon, an employee and acquaintance of Gardiner, overheard defendant, a regular customer, tell Gardiner that he would kill her if she did not stay out of his "business." That same evening at the café, Gagnon heard defendant tell Nelson that if Gardiner went to the police about the Theroux break-in, he would kill Gardiner and dispose of her body where "nobody would find it." The next day, Nelson and defendant reconciled yet again after both he and Young arrived at her East Providence apartment and announced that they would both be moving in with her.

Theroux learned from the West Warwick police that Gardiner had, in fact, given a statement to them that implicated defendant and Young in the break-in. On January 31, 1997, a day during which Nelson, defendant, and Young were in the process of moving from their apartment in East Providence to another one in Warwick, Theroux telephoned Young. Immediately thereafter, Nelson observed defendant and Young in a secretive conversation. When she inquired about their furtive behavior, defendant told her the import of Theroux's call to Young. The defendant and Young then drove off in Nelson's Toyota Tercel.

At 6 that evening, defendant telephoned Gardiner and persuaded her to meet him at a donut shop in Coventry, near her home. Gardiner made arrangements to leave her children in the care of Shawn Ann Machado, a friend who resided in a neighboring apartment. She told Machado that she was meeting defendant so that he could give her money for back rent. At 6:20 p.m., Gardiner left her apartment, telling Machado that she would be back in about twenty minutes. She never returned.

A few hours later, defendant and Young, both stained with blood, returned to their Warwick apartment. They immediately entered a bedroom and removed their clothing. The defendant asked Nelson for a garbage bag, and she watched as they threw the discarded articles of clothing in it. After showering, defendant said that he, Young, and Nelson were "going for a ride." The defendant drove Nelson's Toyota to India Point Park in Providence, where they threw the trash bag into the river. During the return home, defendant handed Gardiner's driver's license to Nel-

---

1. Carol Theroux testified at trial that Young was in the Theroux home "most of the time" and might have known where at least some of the money was located.

son and told her to throw it out the window of the car, which she did.

According to Nelson, defendant explained to her later that evening that he and Young met Gardiner at the donut shop and then drove her to a remote, heavily wooded area off Route 3 on Weaver Hill Road in West Greenwich. He described to Nelson how he dragged Gardiner from the car and tried to strangle her. Unable to do so, he proceeded to punch and kick her. Soon tiring from the beating he was inflicting on Gardiner, he called Young over to help. Nelson testified that defendant admitted to kicking Gardiner between fifty and seventy times himself. The beating resulted in Gardiner's death.

The following morning, defendant orchestrated a plan to conceal Gardiner's murder. He told Nelson to meet him and Young at the West Greenwich home of Young's cousin, Brian Harrington. Although Harrington was not at home when defendant and Young arrived in Nelson's Toyota, they began to clean out the car's interior in the presence of Stacy Benevides, Harrington's girlfriend. By the time Nelson arrived, the two men had removed the carpeting and were in the process of burning it in a barrel, along with other items from the car. The defendant took Nelson aside and told her that if anyone asked about her car, she should answer that he was simply fixing it to make it look better. At defendant's direction, Nelson purchased sand paper and primer paint from a nearby auto parts store so that they could begin the process of repainting the car.

Carol Theroux arrived at the Harrington property at some point early in the afternoon. Theroux agreed to give Nelson a ride to her mother's house to pick up her son. Before the women left, defendant asked Nelson to buy more primer paint. He also placed an empty gasoline container in the trunk of Theroux's car, asking Nelson to fill it with gasoline. Nelson and Theroux returned around 4 p.m., by which time Harrington had also returned from work and was helping defendant and Young prime Nelson's Toyota for repainting. Young and defendant then left in the Toyota, saying that they were going to a liquor store. They returned after an hour, empty-handed. Harrington testified that defendant had told him that they had gone to the store without money. According to Nelson, however, defendant later told her that they had taken the gasoline back to the woods and had burned Gardiner's body.[2]

Meanwhile, Machado was still waiting for Gardiner to return home. Machado was suspicious because, in addition to the fact that Gardiner had told her that she would be gone only twenty minutes, Gardiner previously had told her that she had gone to the police about the breaking and entering at the Theroux home and provided a statement against defendant. On February 1, 1997, the day after Gardiner left to meet defendant, Machado telephoned the police to report her missing.

On February 2, 1997, defendant explained to Nelson that when he and Young had been in Providence the day before, they had noticed that the garbage bag containing the clothing they had worn on the night of Gardiner's murder had washed ashore. That evening, Nelson, defendant, and Young retrieved the bag and drove to East Providence, near the Metacomet Country Club, to dispose of it in

2. The medical examiner's trial testimony revealed that, in addition to evidence of strangulation, Gardiner's body had extensive injuries to the head and lower extremities, including multiple leg fractures, which indicated that she had been kicked. He also testified that her bones had been burned after they had been fractured.

coastal waters. The next day, the three took Nelson's once tan-colored Toyota to an auto body shop to have it repainted blue.

On February 4, 1997, Rhode Island State Police detectives stopped defendant and Young while the pair were driving on Route 95. Detectives Eric Croce and Nicholas Tella informed the men that they were assisting West Warwick police in a missing person investigation. Because they considered the interstate highway an unsafe place to discuss the matter, the detectives asked defendant and Young if they would accompany them to the Lincoln State Police barracks. Both men willingly complied.

At the barracks, the detectives began to question defendant about Gardiner. The defendant admitted that he had once dated her, but insisted that he had broken off the relationship. When the questioning began to focus on Gardiner's disappearance, defendant asked to speak to counsel. He attempted to reach attorney John O'Connor by telephone, but was unsuccessful. The defendant was acquainted with O'Connor through Nelson, whom O'Connor had represented in a number of matters since 1988. Although unable to reach O'Connor, defendant telephoned Nelson and asked her to contact him. O'Connor subsequently telephoned the barracks and was informed that no charges were being brought against defendant, and that he was neither in custody nor under arrest. O'Connor then spoke with defendant and advised him to leave the station. The defendant took O'Connor's advice and left.

While Young and defendant were at the state police barracks, police arrived at their Warwick apartment. Nelson was home at the time but did not cooperate with them. The defendant arrived while the police were still there, and he told them to leave. At 3 a.m., defendant and

Young arrived at Harrington's home, concerned that he might be speaking to the police. Harrington testified that, after he let them into his home, he soon asked them to leave. He also informed them that the state police had been in contact with him.

Nelson testified that the next day, February 5, 1997, she contacted O'Connor, who then advised her to leave the apartment and separate herself from defendant. A few days thereafter, Nelson moved out of the Warwick apartment and into her mother's home in East Providence. Despite these new living arrangements, Nelson and defendant maintained daily contact. During this period, Nelson also called and met with O'Connor frequently, revealing pieces of information to him about Gardiner's murder and the extent of her involvement.

On an evening in March 1997, defendant directed Nelson to drive him and Young back to the woods off Weaver Hill Road in West Greenwich to further dispose of Gardiner's remains. Nelson dropped off the men, with shovels and other tools in their hands, and was instructed to pick them up at 9 p.m. When Nelson returned to the site, defendant told her that they had dug a grave, buried Gardiner's body, and performed some sort of a ceremony for her.

By May 13, 1997, Nelson's steadily growing fear of defendant had become unbearable. On that day, defendant called her at her mother's home to have her bring their son to see him. Apparently because she had asked for money while on the phone, defendant got angry. He arrived at her mother's home twenty minutes later in a car driven by Albert Jacques. A few days earlier, defendant had told Nelson that Jacques and he had broken into a house and had stolen a shotgun, which they then hid in the woods

behind a house where they were staying. The defendant continued to express his outrage at Nelson for asking for money, but he left the house without further incident. The defendant soon telephoned her to apologize, but Nelson's attitude toward him did not soften. She told him that she could no longer continue in such manner and that she needed to protect herself. The defendant dismissed her remarks as meaningless, but she contacted O'Connor that day to tell him that she wanted to talk to the police.[3]

O'Connor contacted the state police on Nelson's behalf that day. He arranged a meeting that included himself, Assistant Attorney General Stephen Dambruch, and representatives of both the West Warwick and state police. During this meeting, an agreement was reached that granted Nelson transactional immunity in exchange for her statement implicating defendant in Gardiner's murder. Dambruch testified that he was aware that O'Connor had contacted the state police on defendant's behalf on February 4, 1997. Dambruch also testified that he had asked O'Connor whether he was still representing defendant, and O'Connor replied that he was not.[4]

Nelson did indeed provide a statement against defendant. On the evening of May 13, 1997, state police obtained an arrest warrant and found defendant at Jacques's home in Coventry. Although it did not appear to the detectives that defendant

was under the influence of any drugs or alcohol when he was placed under arrest, a small amount of marijuana was seized from him at that time. Apparently, defendant did not ask for an attorney while being transported to state police headquarters in Scituate.

Once at the station, defendant was read his rights and signed a rights form. Although he testified during a hearing on his motion to suppress that he "made it clear [he] wanted to call Paul DiMaio," the arresting officers testified that defendant never asked for counsel. The defendant was not informed that Nelson already had been granted immunity, but Dambruch assured him that she would not be prosecuted. According to Dambruch, defendant seemed comforted that his son would, therefore, not require foster placement. Then, while an audio recording was being made, he tearfully confessed to Gardiner's murder.

In the early morning hours of May 14, 1997, defendant led police to the burial site in West Greenwich. With defendant leading the way, the detectives traveled over a mile into the woods before discovering Gardiner's charred remains.[5] Later, the defendant directed them to the area of Narragansett Bay where he and Young had disposed of their blood-stained clothing. State police retrieved a green plastic bag, a pair of soiled jeans, a boot, a jacket,

---

3. Nelson testified that she had feared going to the police earlier because she was afraid of defendant and Young, especially in light of what she knew they had done to Gardiner. She did, however, maintain contact with attorney O'Connor. In fact, on March 20, 1997, O'Connor was present when police executed a search warrant at the home of Nelson's mother.

4. Before defendant was arrested for Gardiner's murder, he went to attorney Paul DiMaio's office in Providence. DiMaio advised defendant at that time that if he were to be picked up for questioning he should remain silent and call counsel, meaning DiMaio himself or someone else.

5. Detective Croce testified that Nelson, too, had brought detectives to the general area of the site just before dark the previous evening. However, she was not able to pinpoint the location of Gardiner's remains.

and some other fragments of clothing from the water.

On October 6, 1997, a Kent County grand jury indicted defendant for murder and conspiracy to commit murder. In a subsequent indictment, defendant was charged with breaking and entering the dwelling of another without consent, stemming from the January 17, 1997 incident at the Theroux home. On November 12, 1998, despite defendant's objection, the state's motion to consolidate the two cases was granted.

Russell Sollitto, defendant's court-appointed attorney, represented defendant at the hearing on November 12, 1998. Also at that time, the hearing justice heard defendant's motion to suppress any statements he made to police on February 4, 1997, and May 13–14, 1997. The hearing justice issued an oral decision on November 13, 1998, denying defendant's motion with respect to the February 4 statements, ruling that defendant was not in custody at that time. With respect to defendant's statements made on May 13 and 14, 1997, the hearing justice determined that defendant was aware of his rights, understood them, voluntarily and without coercion waived them, and then made statements implicating himself. Therefore, the hearing justice denied defendant's motion to suppress in its entirety.

After the hearing justice made these rulings, defendant was given the opportunity to address the court personally. He stated that Sollitto, his court-appointed attorney, had failed to call O'Connor as a witness, despite a promise to do so. The defendant wished to base his defense on his perception that there was collusion between the state and O'Connor, whom he maintained represented him. He also stated that Sollitto failed to call a number of other potential witnesses who presumably would testify as to whether his confession was either coerced or voluntary.[6] Most striking, however, was defendant's admission in open court that he did, indeed, kill Gardiner, but that his confession was "not true" because it was made in an attempt to shield Nelson from prosecution.[7] Sollitto immediately moved to withdraw as defendant's attorney. The defendant intimated that he might represent himself, but the hearing justice made it clear that self-representation was not the best way for defendant to proceed, especially considering the nature of the charges. The defendant then asked to have another attorney appointed for him, and Sollitto's motion to withdraw was granted.

On December 11, 1998, attorney Mark Smith was appointed to represent defendant. The defendant requested to be appointed co-counsel, but the hearing justice rejected this request. He urged defendant not to represent himself and to accept Smith's appointment.[8] The defendant then agreed to have Smith represent him. However, defendant requested to take over his own defense and have Smith act

---

**6.** The defendant also objected to Sollitto's failure to raise a number of other issues, including his claimed psychological and physical abuse at the hands of the police at the time of his arrest, whether he was under the influence of drugs when he made his stationhouse confession, and whether he was psychiatrically capable of giving a voluntary statement to police under the circumstances.

**7.** Prior to the second day of trial, the trial justice admitted defendant's inculpatory suppression-hearing statement that he murdered Gardiner.

**8.** The hearing justice also observed that defendant had the option of representing himself with the assistance of standby counsel, but cautioned that even this alternative was not much more helpful than representing oneself.

as standby counsel if he decided later that Smith was not proceeding in his best interest. Smith responded that defendant's remarks would not affect his appointment.

The defendant subsequently filed a number of motions *pro se*, including a motion to dismiss Smith as his counsel and a motion requesting that the hearing justice recuse himself. At a hearing on February 22, 1999, the hearing justice denied all defendant's requests and responded to defendant's motion to dismiss Smith, his second court-appointed attorney.[9] The defendant exclaimed at one point during the proceeding that he was ready for trial and would be representing himself. The hearing justice replied that "[b]efore I agree to permit you to represent yourself, I need to have certain things made clear upon the record." Despite a number of interruptions from defendant, the hearing justice carried out his duties and informed defendant that although he had a right to represent himself, it was not recommended. The hearing justice refused to proceed without being assured that defendant knew that he had a right to counsel and what it meant to give up that right. The defendant then asked to be represented by Mary McElroy of the Public Defender's Office, despite a conflict of interest issue that office had with respect to defendant's case.[10] Smith then asked to be relieved from representing defendant. The hearing justice took Smith's request under advisement and then said that he would attempt to contact McElroy.

On February 24, 1999, the hearing justice granted defendant's and Smith's respective requests that Smith no longer represent defendant. McElroy also was present at that hearing. She told the court that the conflict with the Public Defender's Office was still present, thus precluding anyone from that office from representing defendant. The defendant reiterated that he wanted to represent himself. The hearing justice again cautioned defendant about self-representation and offered to appoint counsel for him, specifically mentioning that he would be willing to contact attorney Robert Mann. The defendant, however, requested standby counsel because he "would like to be the one to drive." Alternatively, he requested an out-of-state attorney. The hearing justice responded that he had no power to do that. The defendant then requested that attorney Gerard Donley represent him.[11] The hearing justice stated that he would contact Donley, first to see whether he was on the court-appointed list, and, second, whether he would represent defendant. The hearing justice contacted Donley, who appeared before him that afternoon. Donley at that time became defendant's counsel.

---

9. The defendant interrupted the hearing justice several times. He stated that Smith was "nothing but a prosecutor in a defendant's uniform." When Smith began to speak with respect to defendant's motion to dismiss counsel, defendant said to his counsel, "I don't want you in front of me * * * Go on the side with the State." The defendant also claimed that Smith was working with the prosecution. At one point, defendant exclaimed "[t]his whole thing is a farce. I have no respect for this court anymore * * *."

10. Attorney Patrick Burke from the Public Defender's Office had been assigned to represent defendant before Russell Sollitto was appointed. However, Burke had to withdraw because a potential witness, discovered after defendant's arraignment, was a client of the Public Defender's Office. Thus, the Public Defender's Office asserted a conflict that precluded it from representing defendant in this matter.

11. Donley sat at the defense table when attorney Sollitto represented defendant, but Donley at that time was not on the list of potential court appointees for a murder trial.

Donley's tenure as defendant's counsel, however, was short-lived. He moved to withdraw, apparently at defendant's request, citing differences in the direction the defense should take. The hearing justice granted Donley's request to withdraw and then named a number of attorneys that might be available to represent defendant. Apparently discontented with the hearing justice's efforts, defendant again asked for out-of-state counsel, and was denied. The defendant then said that he wished to represent himself and that he understood the rights he was waiving. The hearing justice cautioned that he no longer would offer the services of court-appointed counsel and suggested that defendant have standby counsel. The hearing justice then recessed until the trial date of September 13, 1999, noting that he would appoint standby counsel for defendant.

On September 8, 1999, now before the trial justice, defendant appeared for a status conference and informed the court that he would proceed *pro se* with attorney Christopher Gontarz as standby counsel. The trial date was rescheduled for January 4, 2000. At a hearing on October 27, 1999, intended as a status conference to determine defendant's progress in obtaining a psychiatrist for the purpose of a possible insanity defense, defendant told the trial justice that he no longer wished Gontarz to act as standby counsel. Gontarz confirmed the deterioration of their relationship, and the trial justice relieved Gontarz from further involvement in the case. The defendant once more requested out-of-state counsel, which the trial justice rejected. The defendant at that point was in charge of his own defense, the captain of his own ship.[12]

At a hearing on January 7, 2000, the trial justice addressed a motion filed by attorney O'Connor to quash a subpoena that defendant had issued for the purpose of determining whether O'Connor did anything improper within the chain of events leading up to defendant's indictment. O'Connor testified that he recalled only the February 4, 1997 state police barracks conversation with defendant. He testified that he did not represent defendant at any time, but, rather, was representing Nelson with regard to her possible exposure to prosecution for Gardiner's murder. He said that the reason why he responded to defendant's request at the barracks was that it was his practice to do so whenever somebody made such a request from a police station. The trial justice determined that O'Connor did not say anything to state police regarding Gardiner's murder, but, rather, it was Nelson who provided the statements damning to defendant. Although the trial justice determined that O'Connor had "some sort of attorney/client relationship with Mr. Laurence on February 4, 1997," he granted O'Connor's motion to quash the subpoena, citing that it was Nelson, not O'Connor, who gave the information to the police that was used to prosecute defendant.[13]

---

12. The parties met again before the trial justice for a series of status conferences, with defendant acting *pro se*, on November 3, 1999, December 3, 1999, and December 10, 1999. At the hearing on December 10, 1999, defendant withdrew a planned insanity defense, thereby negating the need for discovery that he had requested and that had been the purpose of several previous hearings. The defendant also moved for the trial justice to recuse himself, citing that the trial justice was not impartial, was biased against defendant, and had an interest in the case. The trial justice denied defendant's motion.

13. After the trial justice granted O'Connor's motion, defendant asserted that he had "no more respect" for the trial justice and that "[y]ou're all crooked." The defendant apolo-

A jury trial finally commenced on January 10, 2000, with defendant appearing *pro se.* On January 27, 2000, the jury returned its verdict, finding defendant guilty of first-degree murder, conspiracy to commit first-degree murder, and breaking and entering. Later that day, the jury returned a further verdict deeming that defendant had committed the murder by means of an aggravated battery. On February 3, 2000, defendant's motion for a new trial was heard and denied. On April 25, 2000, he was sentenced to life in prison without the possibility of parole for Gardiner's murder, ten years for conspiracy to commit murder, and five years for breaking and entering, the latter terms to run concurrently. On May 11, 2000, defendant filed an appeal to this Court, raising the constitutional arguments that we address in turn below.[14]

## II

## ANALYSIS

### A. Alleged Prosecutorial Misconduct

The defendant first argues that the state brokered an agreement with attorney O'Connor, granting transactional immunity to Nelson in exchange for information leading to defendant's arrest and indictment for Gardiner's murder, despite O'Connor's representation of defendant in the same matter. He contends that his convictions should be dismissed because the state and O'Connor colluded and engaged in improper prosecutorial conduct, in violation of his Fifth Amendment right to due process and Sixth Amendment right to effective assistance of counsel. The state responds that O'Connor was not in-

volved in an attorney-client relationship with defendant when he confessed to Gardiner's murder and, therefore, the government's conduct was not so outrageous to constitute a due process violation. Indeed, the state argues that under the circumstances, its conduct was exemplary.

■ Government interference in an attorney-client relationship may render a defendant's legal assistance so ineffective as to violate both his Fifth Amendment right to due process and his Sixth Amendment right to counsel. *United States v. Irwin,* 612 F.2d 1182, 1185 (9th Cir.1980). However, even government conduct that arguably might be labeled as interference is not always an infringement on those rights. *Id.* The right to due process and right to counsel are violated only when the interference prejudices the defendant. *United States v. Marshank,* 777 F.Supp. 1507, 1519, 1525 (N.D.Cal.1991) (citing *Irwin,* 612 F.2d at 1187).

■ "A Fifth Amendment due process violation may occur when government interference in an attorney-client relationship results in ineffective assistance of counsel or when the government engages in outrageous misconduct." *Marshank,* 777 F.Supp. at 1519. Whether the government behavior constitutes outrageous misconduct is determined by the totality of the circumstances. *United States v. Tobias,* 662 F.2d 381, 387 (5th Cir.1981). We note that the defense of outrageous government misconduct has been much criticized and has evaded precise definition. *See United States v. Tucker,* 28 F.3d 1420, 1425 (6th Cir.1994) (describing how the lack of a sound basis for the defense has engendered contradictory standards, al-

gized on the first day of trial for making these comments.

**14.** *For the purposes of this appeal,* defendant apparently was able to retain the services of

the Public Defender's Office, who wrote defendant's memorandum and also argued before this Court.

though the results are almost unanimously unsuccessful for defendants); *United States v. Santana,* 6 F.3d 1, 4 (1st Cir. 1993) ("[t]he banner of outrageous misconduct is often raised but seldom saluted"). Although there does not appear to be a universally-accepted standard, the Tenth Circuit's articulation of this defense is succinct and useful:

> " 'Government conduct is outrageous if "considering the totality of the circumstances in any given case, the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice." ' * * * Outrageous conduct generally requires government creation of a crime or substantial coercion to induce the crime. * * * 'The outrageous conduct defense, however, is an extraordinary defense that will only be applied in the most egregious circumstances.' * * * 'It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating.' " *United States v. Sandia,* 188 F.3d 1215, 1219 (10th Cir.1999).

■ "A court may also dismiss an indictment when 'the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.' " *Marshank,* 777 F.Supp. at 1523 (quoting *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)). A trial court's refusal to dismiss an indictment based on outrageous government conduct is a question of law that is reviewed *de novo. Sandia,* 188 F.3d at 1219. While a claim of outrageous government conduct is reviewed *de novo,* the state of the record and the hearing justice's recitation of the facts are reviewed with deference and will be disturbed only if clearly wrong. *Simpson v. State,* 769 A.2d 1257,

1265–66 (R.I.2001) (citing *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

■ We discern two categories of outrageous misconduct cases: (1) those in which the government is an active participant in the crime, and (2) those involving the subversion of a defendant's attorney to prosecute that defendant. When the courts have found outrageous conduct, it has usually been in cases under the first scenario, in which the government generated and participated in the crime. *See, e.g., United States v. Twigg,* 588 F.2d 373 (3d Cir.1978) (reversing conviction where government conduct was aimed at engendering crimes for the purpose of bringing criminal charges against defendant who was otherwise lawfully going about his affairs); *United States v. Gardner,* 658 F.Supp. 1573 (W.D.Pa.1987) (dismissing indictment against defendant who was not predisposed to procuring drugs for others because government agents created the crime for the sake of obtaining a conviction); *United States v. Bartres–Santolino,* 521 F.Supp. 744 (N.D.Cal.1981) (dismissing indictment where defendants were not involved in drug-related activities until government supplied the drugs and set the criminal enterprise in motion). A defendant must meet a very high standard when demonstrating outrageous government conduct because the "involvement must be *malum in se* or amount to the engineering and direction of the criminal enterprise from start to finish." *United States v. Smith,* 924 F.2d 889, 897 (9th Cir.1991) (citing *United States v. Citro,* 842 F.2d 1149, 1153 (9th Cir.1988) (holding that drug agents' encouraging patients in drug-treatment centers to deal drugs was not so outrageous to constitute a due process violation)). Put another way, the "criminal design originates with the officials of the Government, and they implant in the mind

of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (quoting *Sorrells v. United States,* 287 U.S. 435, 442, 53 S.Ct. 210, 77 L.Ed. 413 (1932)).

*Marshank* perhaps best illustrates the second category of outrageous government misconduct cases. In *Marshank,* a United States District Court dismissed an indictment against a defendant whose attorney approached government agents on behalf of another client and offered to aid in the investigation of the defendant. The government agents conspired with the defendant's attorney to ensure his arrest, directed the defendant to the attorney, and even participated in efforts to conceal the attorney's conflict of interest. The district court held that the defendant's Fifth Amendment rights to effective assistance of counsel and to be free from outrageous government conduct, as well as his Sixth Amendment right to counsel, were violated because the agents actively worked with the defendant's attorney and ensured that the attorney would represent the defendant despite the obvious conflict of interest.

■ Although the first scenario is more common, the instant matter requires us to consider, as did the *Marshank* Court, whether the state interfered with an existing attorney-client relationship between O'Connor and defendant to facilitate its prosecution of defendant. Indeed, the defendant relies heavily on *Marshank,* despite the trial justice's observation that "[t]his case does not remotely resemble *Marshank.*" We agree with the trial justice; the facts in this case are markedly different from those in *Marshank.* The defendant here was a suspect in Gardiner's disappearance before state police questioned him on February 4, 1997, the date

of his first and only contact with O'Connor concerning the investigation. The state police were aware that Gardiner was going to meet defendant just before she disappeared. They already had Gardiner's statement that defendant was involved in the break-in at the Theroux home. They also knew that defendant had threatened Gardiner about a week before she disappeared. Moreover, Harrington and Benevides had spoken to the police about their observations of defendant the day after Gardiner's disappearance.

At the hearing on January 7, 2000, the trial justice determined that Nelson, not O'Connor, "conveyed declarations to the state police and the Attorney General's Office as to what [defendant] said to her regarding the killing of the woman and the disposal of her body." The trial justice also found that although O'Connor had "some sort of attorney/client relationship" with defendant on February 4, 1997, "[t]here is not one shred of tangible or physical evidence indicating that there was an attorney/client relationship between these two as we approached the dates of May 13th and May 14th," when defendant was arrested and in the custody of state police. Dambruch, aware of O'Connor's previous involvement with defendant a few months earlier, specifically asked O'Connor if he represented defendant. O'Connor responded that he did not represent defendant, but Nelson. Nelson's testimony confirmed that O'Connor was advising her. O'Connor did not report to Dambruch any information about Gardiner's murder of which he was made aware; Nelson alone revealed the information that led to defendant's arrest.

We recognize that although the trial justice determined that O'Connor and defendant "had some sort of attorney/client relationship" on February 4, 1997, he also determined that no such relationship exist-

ed on May 13, 1997 when he presented Nelson to the state police. Even if we accept the existence of an attorney-client relationship between O'Connor and defendant arising from the February 4, 1997 barracks conversation, and whatever subsequent colloquy may have occurred between them, there simply is no evidence that O'Connor told the state police anything implicating defendant. Even if we were to accept defendant's contention that O'Connor's actions violated the rules of professional conduct, there is not a scintilla of evidence that the attorney was acting as an agent of the state police or the Attorney General's Office. Absent a determination of collusion between the prosecution and O'Connor, defendant faces an insurmountable burden to demonstrate the type of outrageous government conduct necessary to invalidate his statements that he was the perpetrator of this vicious murder.

After considering the totality of the circumstances, we conclude that the state's conduct in the investigation and subsequent prosecution of defendant was not outrageous and certainly does not shock the universal sense of justice. Indeed, it was top-notch police work that resulted in the conviction of defendant for this heinous homicide and other felonious activity.

### B. Effective Assistance of Counsel

The defendant next argues that the trial court's failure to afford him the assistance of constitutionally effective counsel impermissibly forced him to represent himself. He further contends that he did not at any time waive his right to counsel and did not freely choose to represent himself. Instead, he alleges that he was faced with a choice between proceeding with an attorney who would refuse to raise legitimate defenses or no attorney at all. The state counters that defendant's unsupported claims of conspiracy against his court-appointed attorneys, as well as his rejection

of numerous others under similar reasoning, does not constitute good cause. Therefore, the state submits, defendant's rejection of several competent attorneys demonstrates that he voluntarily waived his right to counsel, and that he was in no way forced to represent himself.

▮ The defendant's dispute with his three court-appointed attorneys involved his perceived failure on their part to raise the issue of O'Connor's representation of Nelson when her immunity deal was struck, and which he contends subsequently led to his prosecution. Thus, he claims that he was forced to represent himself by default. His refusal of lawyers from the court's short list, he submits, was born of his justifiable frustration with the inaction of his previous attorneys and was not in any sense a true waiver of the right to counsel. In any event, he contends that his behavior does not come close to meeting the standard for a legitimate waiver of the right to the assistance of counsel. We disagree.

▮ The Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution provide that in all criminal prosecutions, the accused enjoys the right to the assistance of counsel. Whether defense counsel is retained or appointed, this right ensures that the trial is fair. *Kimmelman v. Morrison*, 477 U.S. 365, 377, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). "In other words, the right to counsel is the right to effective assistance of counsel." *Id.* The Sixth Amendment also allows a defendant in a criminal trial to represent himself, provided that his waiver of counsel is valid. *State v. Spencer*, 783 A.2d 413, 416 (R.I. 2001) (citing *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)).

■ This Court employs a two-prong analysis to review the validity of a defendant's waiver of counsel: first, we must determine whether the waiver was "voluntary"; then, we must determine whether it was "knowing and intelligent." *State v. Thornton*, 800 A.2d 1016, 1025 (R.I.2002) (quoting *State v. Briggs*, 787 A.2d 479, 486 (R.I.2001) and citing *State v. Chabot*, 682 A.2d 1377, 1380 (R.I.1996) (per curiam)). When considering the validity of the waiver, we examine the totality of the circumstances. *Chabot*, 682 A.2d at 1379–80 (citing *State v. Perry*, 508 A.2d 683, 687–88 (R.I.1986)). These determinations are reviewed *de novo*, with deference to the trial justice's findings of historical fact. *Thornton*, 800 A.2d at 1026 (citing *Simpson v. State*, 769 A.2d 1257, 1265–66 (R.I.2001)).

"It is generally acknowledged that absent any showing of 'good cause' for a defendant's refusal to accept court-appointed counsel, such refusal is functionally equivalent to a voluntary waiver of the right to counsel." *Thornton*, 800 A.2d at 1025. In *Thornton*, we further held that the defendant's "repeated refusal to accept the services of competent court-appointed defense counsel demonstrates clearly the voluntary waiver of his right to counsel, and that he was not in any way unconstitutionally 'forced' to proceed *pro se*." *Id.* at 1026. In reaching this conclusion in *Thornton*, we determined that the rejection of "three different, capable, experienced court-appointed defense attorneys" was "constitutionally voluntary," and that the "options offered to [the defendant]—accepting the services of previously appointed counsel, hiring private counsel, or proceeding *pro se* with standby counsel—all met constitutional muster." *Id.* at 1025–26.

■ Although it is preferable to do so, a trial justice is not constitutionally required to advise a defendant of the risks of proceeding *pro se*. *Thornton*, 800 A.2d at 1026. "The trial justice 'need not make any assessment of the extent of the defendant's technical legal knowledge in determining the defendant's knowing exercise of the right to defend himself.' " *Briggs*, 787 A.2d at 485 (quoting *State v. Costa*, 604 A.2d 329, 330 (R.I.1992) and citing *Faretta*, 422 U.S. at 836, 95 S.Ct. 2525). "[T]he inquiry 'must be pragmatic and directed to the "particular stage of the proceedings in question." ' * * * We are persuaded that an examination of the totality of the circumstances, in light of the particular stage of the proceedings at the time the waiver is proposed, is the better approach to determine whether a waiver of counsel is knowing, voluntary and intelligent." *Thornton*, 800 A.2d at 1027 (quoting *Spencer*, 783 A.2d at 416–17).

■ When the competence of a defendant is not an issue in assessing the validity of his waiver, this Court recommends, but does not require, that trial justices consider the six factors discussed in *Chabot*, which we framed as follows:

"(1) the background, the experience, and the conduct of the defendant at the hearing, including his age, his education, and his physical and mental health; (2) the extent to which the defendant has had prior contact with lawyers before the hearing; (3) the defendant's knowledge of the nature of the proceeding and the sentence that may potentially be [ ]imposed; (4) the question of whether standby counsel has been appointed and the extent to which he or she has aided the defendant before or at the hearing; (5) the question of whether the waiver of counsel was the result of mistreatment or coercion; and (6) the question of whether the defendant is trying to manipulate the events of the hearing." *Thornton*, 800 A.2d at 1027 (quoting

*Briggs,* 787 A.2d at 486 and citing *Chabot,* 682 A.2d at 1380).

"While not mandatory, the factors set forth in *Chabot* may be used as a guide in determining a valid waiver of counsel." *Briggs,* 787 A.2d at 486 (citing *Spencer,* 783 A.2d at 413). The *Chabot* factors, however, are mandatory in those cases in which the mental competency of the defendant is questioned. *Spencer,* 783 A.2d at 417. While defendants may elect to represent themselves at trial, "they must do so with their eyes wide open to the pitfalls ahead." *Id.* at 418 (citing *Chabot,* 682 A.2d at 1380); *see also Faretta,* 422 U.S. at 835, 95 S.Ct. 2525 (the record should establish that a defendant electing to represent himself " 'knows what he is doing and his choice is made with eyes open' "). "[A] defendant need not himself [or herself] have the skill and experience of a lawyer in order competently and intelligently to choose self-representation * * *. [T]echnical legal knowledge * * * [is] not relevant to an assessment of [a defendant's] knowing exercise of the right to defend himself [or herself]." *Faretta,* 422 U.S. at 835, 836, 95 S.Ct. 2525; *see also Chabot,* 682 A.2d at 1380 n. 5.

We have further noted that "[t]he Sixth Amendment provides no right to counsel 'who would blindly follow [a defendant's] instructions.' " *Thornton,* 800 A.2d at 1029 n. 14 (quoting *McQueen v. Blackburn,* 755 F.2d 1174, 1178 (5th Cir.1985)). "Nor is there any 'absolute right to counsel of one's choice.' " *Id.* (quoting *United States v. Peister,* 631 F.2d 658, 661 (10th Cir.1980)).

In the present matter, we note that defendant at various times leading up to his trial had the gratuitous services of three court-appointed attorneys and one standby counsel, all of whom dissatisfied him because he contended that they were not working in his best interests. Additional-ly, he was offered the services of well-respected attorneys whom he summarily dismissed without even meeting with them. Although defendant asserted many times at trial that it was not his desire to represent himself and that he felt coerced into doing so, his repeated rejection of competent attorneys betrays a dilatory intent.

Our review of the record in this matter demonstrates that both the hearing justice and the trial justice informed defendant of the consequences of waiving the right to counsel and proceeding *pro se.* Both demonstrated admirable patience in dealing with him. The defendant's continual rejections of competent in-state attorneys, numerous interruptions during those proceedings when he was represented, and his efforts to revisit the issue of suppressing his confession despite the determination of that issue, demonstrate an obstructionist posture in these proceedings. Although defendant faulted his various attorneys, an attorney cannot raise arguments that are inconsistent with the law.

■ The defendant's actions, rather than his words, demonstrate that he waived his right to counsel. The right to counsel does not mean the counsel of his choice, and certainly does not mean that he is entitled to out-of-state counsel. *See Bedrosian v. Mintz,* 518 F.2d 396, 401 (2d Cir.1975) ("[t]o appoint out-of-state counsel when there are qualified in-state counsel ready and willing to represent indigents can only serve to hamper" the state objective of "developing a pool of competent attorneys to represent indigents"). Because the trial justice was not bound to grant him out-of-state counsel, defendant's argument that he was forced to represent himself as a result is meritless. It seems obvious that defendant was not willing to work with any counsel in any capacity. This was no fault of the judiciary, which bent over backwards to attain representa-

tion for him. He repeatedly was advised against rejecting the services of competent counsel and implored to at least accept the help of court-appointed standby counsel.

The hearing justice and the trial justice were both exceedingly patient with defendant. They resisted defendant's efforts to reject counsel, but finally recognized his right to represent himself. Cognizant of defendant's rights, the trial justice commendably pursued an effort to permit defendant to proceed with the assistance of standby counsel. The defendant has failed to show good cause for his refusal to accept court-appointed counsel. His naked assertions that all the attorneys appointed to him somehow worked with each other against him or somehow were involved with the state against him, were baseless and a slur against the legal profession in this state. In accordance with *Thornton,* his continued rejection of competent representation is the equivalent to a voluntary waiver of his Sixth Amendment right to counsel.

Other than defendant's notion that he was forced to represent himself, the record is devoid of evidence demonstrating that his election to do so was the result of mistreatment or coercion. The justices' frequent suggestions that defendant retain counsel were repeatedly rebuffed. Both the hearing justice and the trial justice consistently inquired as to his understanding of the right he was giving up, and ultimately they were satisfied with his responses. Although defendant had a traditional education only up to the tenth grade, he had obtained a G.E.D. as an adult. Moreover, the record shows that he was a "law clerk" while incarcerated and was familiar with the law to a certain degree. His competency was never an issue at trial; indeed, he refused to proceed with a possible insanity defense.

Practically speaking, allowing defendant to proceed in his quest to reject every capable person offered to provide him counsel "would be to prevent any trial whatever until the accused person himself should be pleased to permit it." *Illinois v. Allen,* 397 U.S. 337, 349, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring) (quoting *Falk v. United States,* 15 App.D.C. 446, 454 (1899)). We hold that due process does not require us to reverse defendant's convictions because he was denied the right to counsel under the totality of the circumstances here; rather, we cannot allow him, protected as he is "by all the safeguards with which the humanity of our present criminal law sedulously surrounds him," to "defy the processes of that law, paralyze the proceedings of courts and juries and turn them into a solemn farce, and ultimately compel society, for its own safety, to restrict the operation of the principle of personal liberty." *Id.* at 349–50, 90 S.Ct. 1057 (Brennan, J. concurring) (quoting *Falk,* 15 App.D.C. at 460). Therefore, after careful *de novo* review, we conclude that the record establishes defendant's voluntary, knowing, and intelligent waiver of his right to counsel.

A review of the totality of the circumstances in this case reveals that the defendant was well acquainted with the pitfalls of self-representation and yet elected to represent himself. With "eyes open," the defendant chose the course of action that he now claims violated his constitutional rights.

### III

### CONCLUSION

For the foregoing reasons, the defendant's appeal is denied and the judgment appealed from is affirmed. The papers of

the case are remanded to the Superior Court.

Chief Justice WILLIAMS did not participate.

FLANDERS, J., concurring.

Although I join the Court's opinion affirming the defendant's conviction, I write separately only because I do not agree with the proposition set forth in the majority opinion that "a trial justice is not constitutionally required to advise a defendant of the risks of proceeding *pro se*," citing to this Court's opinion in *State v. Thornton*, 800 A.2d 1016, 1026 (R.I.2002). For the reasons set forth in my dissent in that case, *id.* at 1050–53, I still believe that, pursuant to the right-to-counsel provisions in both the United States and the Rhode Island Constitutions, "some type of inquiry or communication between the court and defendant is required to ascertain whether defendant is aware of 'the dangers and disadvantages of self-representation,' before defendant sets a course leading to *pro se* representation." *Id.* at 1050.

In *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the United States Supreme Court ruled that each defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'"

In this case, however, that issue is a moot point because the trial justice did exactly that by ascertaining on the record that the defendant appreciated the significant downside risks of representing himself at trial. Therefore, although I disagree with the majority's reliance on the above-quoted proposition from the *Thornton* case to support its conclusion, I agree with the Court's holding that in this case the defendant knowingly waived his right to counsel.